[Cite as *State v. Bollheimer*, 2020-Ohio-60.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-02-014 |
| | : | O P I N I O N |
| - vs - | | 1/13/2020 |
| | : | |
| NATHANIEL BOLLHEIMER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 18CR34459

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

The Helbling Law Firm, LLC, John J. Helbling, 6539 Harrison Avenue, Box 124, Cincinnati, Ohio 45247, for appellant

**RINGLAND, P.J.**

{¶ 1} Appellant, Nathaniel Bollheimer, appeals from his conviction in the Warren County Court of Common Pleas for aggravated possession of drugs. For the reasons outlined below, we affirm.

{¶ 2} In July 2018, Bollheimer was indicted for aggravated possession of drugs in violation of R.C. 2925.11(A). The charge stemmed from the search of a motel room at a

Motel 6 in Warren County ("Room 259") in May 2018. The day of the search, police were alerted by Bollheimer's mother that he and another individual, Justin Cullers, were staying in Room 259 and that both men had active warrants for their arrest. At that point, Deputy Phillip Green of the Warren County Sheriff's Office confirmed the warrants and went to the motel with two additional deputies and his sergeant. Prior to Deputy Green's arrival, two plainclothes detectives went to the motel to investigate. Upon arriving, the detectives spoke with a housekeeper, who identified Bollheimer and Cullers as the guests in Room 259. According to the housekeeper, Cullers and Bollheimer had stayed past their designated checkout time. The housekeeper then guided the deputy and detectives to Room 259, knocked on the door, and announced, "housekeeping." The guests did not respond to the housekeeper's knocking, which prompted her to make entry into the room with her key. At that time, Deputy Green recognized the two men and placed them under arrest. While arresting the two men, Deputy Green observed methamphetamine and drug paraphernalia on the counter of the motel room.

{¶ 3} Bollheimer entered a plea of not guilty to the charge. Thereafter, in September 2018, Bollheimer filed a motion to suppress, wherein he argued that the evidence obtained from the search of Room 259 should be suppressed because there was no probable cause that Bollheimer was engaged in or about to engage in criminal activity, and he did not otherwise consent to the search. After a hearing, the trial court denied Bollheimer's motion. In doing so, the trial court found that Bollheimer failed to meet his burden of proving that he had a reasonable expectation of privacy in Room 259 at the time of the search.

{¶ 4} The matter proceeded to a jury trial. The state presented four witnesses in its case-in-chief, and Bollheimer presented three witnesses in his defense. The jury returned a guilty verdict, and the trial court sentenced Bollheimer to 24 months in prison. Bollheimer now appeals, raising four assignments of error.

{¶ 5} Assignment of Error No. 1:

{¶ 6} THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT-APPELLANT'S MOTION TO SUPPRESS.

{¶ 7} In his first assignment of error, Bollheimer argues the trial court erred in denying his motion to suppress the evidence found in Room 259 after the officers entered the room with only an arrest warrant.

{¶ 8} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Burkhead*, 12th Dist. Preble No. CA2008-11-022, 2009-Ohio-4466, ¶ 7; *State v. Burnside*, 100 Ohio St. 3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility. *State v. Eyer*, 12th Dist. Warren No. CA2007-06-071, 2008-Ohio-1193, ¶ 8. In turn, the appellate court must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Lange*, 12th Dist. Butler No. CA2007-09-232, 2008 Ohio 3595, ¶4; *State v. Bryson*, 142 Ohio App.3d 397, 402 (12th Dist.2001). After accepting the trial court's factual findings as true, the appellate court must then determine, as a matter of law, and without deferring to the trial court's conclusions, whether the trial court applied the appropriate legal standard. *State v. Forbes*, 12th Dist. Preble No. CA2007-01-001, 2007-Ohio-6412, ¶ 29; *State v. Dierkes*, 11th Dist. Portage No. 2008-P-0085, 2009-Ohio-2530, ¶ 17.

{¶ 9} Bollheimer initially argues that his motion to suppress should have been granted because he maintained a privacy interest in Room 259 and did not consent to the search of the room. As such, Bollheimer claims his Fourth Amendment rights were violated when the officers entered Room 259 in order to effectuate his arrest.

{¶ 10} "The Fourth Amendment generally prohibits police from making a warrantless,

nonconsensual entry into a suspect's home to make a felony arrest." *Payton v. New York*, 445 U.S. 573, 588-589, 100 S.Ct. 1371 (1980). It is well established that the protection provided by the Fourth Amendment extends to hotel rooms. *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408 (1966), citing *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 (1951) ("[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office").

{¶ 11} In *Payton*, the United States Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton* at 603. "'Accordingly, pursuant to *Payton*, an arrest warrant is sufficient to enter a person's residence to effectuate the warrant if the police have reason to believe that the suspect lives in the home and is in fact at the home at the time the arrest warrant is executed.'" *State v. Cooks*, 2d Dist. Clark No. 2016-CA-40, 2017-Ohio-218, ¶ 10, quoting *State v. Zerucha*, 11th Dist. Ashtabula No. 2015-A-0031, 2016-Ohio-1300, ¶ 13. Federal courts have indicated that "[t]he protections against warrantless intrusions into the home announced in *Payton* * * * apply with equal force to a properly rented hotel room *during the rental period*." *United States v. Junkman*, N.D. Iowa No. CR96-4033, 1997 U.S. Dist. LEXIS 24888, *3 (June 24, 1997), citing *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir.1986) and *United States v. Wicks*, 995 F.2d 964, 969 (10th Cir.1993). (Emphasis added.)

{¶ 12} Similarly, Ohio courts have found that a person's motel room, like a person's home, must be free of warrantless intrusions and that any lesser standard is presumptively unreasonable. *State v. Nicole*, 4th Dist. Athens No. 99CA49, 2001-Ohio-2451, *12; *State v. Miller*, 77 Ohio App. 3d 305, 312 (8th Dist.1991); *State v. Montgomery*, 2d Dist. Clark No. 98 CA 82, 2000 Ohio App. LEXIS 1339, *11 (Mar. 31, 2000). However, despite the right to be free from warrantless intrusions, once the motel guest "voluntarily abandons the room, his

status is lawfully terminated, or the rental period has expired, the guest no longer has a legitimate expectation of privacy in the [m]otel room." *State v. Oliver*, 8th Dist. Cuyahoga No. 106305, 2018-Ohio-3667, ¶ 32, citing *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir.2004). Additionally, a motel employee may consent to the entry to and search of a person's motel room where the renter or occupant has either abandoned the room or surrendered his tenancy. *United States v. Savage*, 564 F.2d 728, 733 (5th Cir.1997).

{¶ 13} At the suppression hearing, a housekeeper for the motel testified that the checkout time for the motel is 11:00 a.m. and that guests are expected to check out at that time. According to the housekeeper, if guests stayed after 11:00 a.m. without paying for an additional night she had authority to "kick them out." On the date of the search, the housekeeper went to Room 259 around 11:00 a.m. to "see if [Bollheimer and Cullers] were going to stay in another night or * * * if they were checking out that day." Neither guest responded to the housekeeper's knocking. As a result, using her key, the housekeeper opened the door and saw Cullers by the counter and Bollheimer lying on the bed. At that point, the housekeeper informed the two guests that it was time to check out, to which they eventually responded that they were unsure if they were staying over or checking out. The housekeeper then went to the front office, which sent her back to Room 259. According to the housekeeper, the only reason the front desk would have sent her back to Room 259 was because the guests had not paid for an additional night. Thereafter, the police arrived at the motel around 11:15 a.m., showed her photographs of two individuals, and asked if she recognized the men depicted in the photographs. The housekeeper identified the men in the photographs as the guests staying in Room 259. The housekeeper then led the officers to Room 259, knocked on the door, and stated, "housekeeping." Like her initial encounter with the guests in Room 259, the men did not respond to her knocking, and she used her key to open the door. At that time, the officers announced their presence and entered Room 259.

{¶ 14} Bollheimer argues that, although a motel room may be searched upon consent of motel employees once a guest has abandoned the premises, it was impermissible here because the housekeeper was unsure whether the guests had paid for an additional night and because they had not returned the key to their room. We disagree.

{¶ 15} There was competent credible evidence presented at the suppression hearing that Bollheimer had relinquished Room 259 at the time of the search. Specifically, the housekeeper testified that if guests plan to stay for an additional night, they are required to pay for that night before their rental period expires. If the guests fail to pay for the additional night, they are expected to leave at checkout time. Here, the record indicates that Bollheimer did not pay for an additional night before he was required to check out of Room 259. The record also reflects that, despite the housekeeper's statement that it was time to check out, neither Bollheimer nor Cullers stated whether the pair intended to stay another night or leave the motel. As such, we find Bollheimer automatically relinquished all rights of privacy to the room when his rental period expired.

{¶ 16} We are unpersuaded by Bollheimer's argument that, like the Eighth District held in *Miller*, a guest must return his key to the motel management before a motel guest automatically relinquishes his room at checkout time. *State v. Miller*, 77 Ohio App. 3d 305, 313 (8th Dist.1991), citing *United States v. Savage*, 564 F.2d 728, 733 (5th Cir.1997). In this case, there was no testimony presented at the suppression hearing as to whether the key was returned prior to the search of Room 259. Even assuming arguendo that Bollheimer did not return the key prior to the search, we agree with our sister court that the return of the key is of less significance than the fact that the checkout time had passed. *State v. Montgomery*, 2d Dist. Clark No. 98 CA 82, 2000 Ohio App. LEXIS 1339, *11 (Mar. 31, 2000). This viewpoint is shared by several circuit courts, including the Sixth Circuit, which have indicated that once a guest's rental period expires or has been lawfully terminated, that guest "does not

have a legitimate expectation in the hotel room[.]" *United States v. Allen*, 106 F.3d 695, 699 (6th Cir.1997), quoting *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir.1987); *see also United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir.1992). Accordingly, we find that the return of Room 259's key card is immaterial to whether Bollheimer maintained a privacy interest in the room.[1]

{¶ 17} It is undisputed that the officers arrived at the motel after the designated checkout time and that Bollheimer remained in the room after that time. As such, because Bollheimer had stayed past his checkout time, never expressed an intent to pay for an additional night, and failed to pay for an additional night before his rental period expired, we find Bollheimer effectively surrendered his tenancy and automatically relinquished Room 259 at the checkout time. At that point, the housekeeper, as a motel employee, was authorized to provide the officers with consent to search Room 259. *Montgomery* at *11.

{¶ 18} We also reject Bollheimer's argument that the officers should have determined the rental status of the room prior to entering. Rather, we find the officers were permitted to enter the room to execute the arrest warrants, regardless of the room's rental status. As discussed above, in situations involving hotel and motel rooms, if the person named in the arrest warrant is a tenant residing in the hotel room, *Payton* permits the officers to enter the room to effectuate the arrest warrant if they have a reasonable belief that the person named in the arrest warrant is a tenant and present inside the room. *Payton*, 445 U.S. at 603. "Reasonable belief is established by looking at common sense factors and evaluating the totality of the circumstances." *State v. Cooks*, 2017-Ohio-218 at ¶ 11, citing *United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir.2006). "A reasonable belief is something less than

---

1. We note that when motel rooms are paid for in advance, as was the case here, it is common practice upon vacating to leave the key card with a housekeeping tip in the room, as opposed to returning the key card to the front desk.

probable cause." *Id.*

{¶ 19} In the instant matter, there was no testimony at the suppression hearing as to whether Bollheimer or Cullers was the registered tenant of the motel room. However, Deputy Green testified he received information that both individuals were staying in Room 259. He then confirmed, prior to arriving at the motel, that both individuals had active arrest warrants in Warren County. Upon the officers' arrival, the information regarding Bollheimer's and Cullers' presence in Room 259 was corroborated by the housekeeper, who testified that after viewing the photographs of the two individuals, she recognized them as the men staying in Room 259 and told the officers the men were in the room at that time.

{¶ 20} Based upon the totality of the circumstances, we find it was reasonable for the officers to believe that either Bollheimer or Cullers, each a subject of a corresponding arrest warrant, was a tenant of Room 259 on the day in question. Further, it was reasonable for the officers to believe the individuals were inside the room considering the information provided by Bollheimer's mother, and the housekeeper's statement to the officers that the individuals remained in Room 259. Because the officers had arrest warrants for Bollheimer and Cullers, and maintained a reasonable belief that either Bollheimer or Cullers were a tenant present inside of the motel room, the officers were constitutionally permitted to enter the room to effectuate their arrest. Accordingly, because the initial entry into Room 259 was lawful pursuant to *Payton*, the officers properly seized the drug paraphernalia that was in plain view. *State v. Meyers*, 12th Dist. Warren No. CA2003-03-037, 2004-Ohio-1717, ¶ 34.

{¶ 21} In accordance with the above, the trial court did not err in denying Bollheimer's motion to suppress. Bollheimer's first assignment of error is therefore, overruled.

{¶ 22} Assignment of Error No. 2:

{¶ 23} THE JURY ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FINDING HIM GUILTY OF AGGRAVATED POSSESSION WITHOUT SUFFICIENT

EVIDENCE.

{¶ 24} Assignment of Error No. 3:

{¶ 25} THE JURY ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FINDING HIM GUILTY OF AGGRAVATED POSSESSION AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 26} In his second and third assignments of error, Bollheimer argues the state failed to supply sufficient evidence to support the charge of aggravated possession, and that his conviction was against the manifest weight of the evidence. We disagree.

{¶ 27} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 28} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 29} In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 30} Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, a "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 31} As noted above, Bollheimer was convicted of aggravated possession of drugs in violation of R.C. 2925.11(A). Pursuant to that statute, "[n]o person shall knowingly * * * possess * * * a controlled substance or a controlled substance analog." Further, R.C. 2925.11(C)(1)(b) provides that if the drug is included in schedule II, like methamphetamine, and "the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, aggravated possession of drugs is a felony of the third degree and there is a presumption for a prison term for the offense."

{¶ 32} Bollheimer does not dispute that the substance Deputy Green discovered in Room 259 was methamphetamine, or that the amount of methamphetamine was equal to or exceeded the bulk amount but was less than five times the bulk amount. Rather, he argues that the state failed to prove that he knowingly possessed the drugs found in the motel room.

{¶ 33} As defined by R.C. 2901.22(B), a person acts knowingly, regardless of purpose, "when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." A defendant's knowledge may be

inferred from the totality of the surrounding circumstances. *State v. NRAG, LLC*, 12th Dist. Fayette No. CA2008-12-043, 2009-Ohio-4137, ¶ 22. On the other hand, the term "possession" means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession may be constructive or actual. *State v. Williams*, 12th Dist. Butler No. CA2014-09-180, 2015-Ohio-2010, ¶ 14.

{¶ 34} "An accused has 'constructive possession' of an item when the accused is conscious of the item's presence and is able to exercise dominion and control over it, even if the item is not within the accused's immediate physical possession." *State v. Jest*er, 12th Dist. Butler No. CA2010-10-264, 2012-Ohio-544, ¶ 25. Constructive possession may be proven by circumstantial evidence alone. *Williams* at ¶ 15. This is because "[c]ircumstantial and direct evidence are of equal evidentiary value." *State v. Frye*, 5th Dist. Richland No. 17CA5, 2017-Ohio-7733, ¶ 46, citing *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991). "Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession." *State v. Caudill*, 12th Dist. Madison No. CA2017-05-011, 2018-Ohio-550, ¶ 12.

{¶ 35} At trial, Deputy Green testified that on the day of the search, he responded to a call that Bollheimer and Cullers, who had active arrest warrants at the time, were staying in Room 259 of a Motel 6 in Warren County. Consistent with the testimony he provided at the suppression hearing, Deputy Green then indicated that he arrived at the motel around 11:20 a.m. and made contact with the housekeeper. The housekeeper then led the deputy and his fellow officers to Room 259 where Bollheimer and Cullers were staying. The housekeeper knocked on the door and neither Bollheimer nor Cullers responded. At that time, the

housekeeper used her key to open the door and Deputy Green announced his presence. When the housekeeper initially opened the door, Deputy Green observed Bollheimer "lying on the bed, face down." Bollheimer then looked up toward the door and the deputy recognized him. At that point, the deputy entered Room 259 to execute the arrest warrants. Deputy Green testified that while he was placing Bollheimer under arrest, Bollheimer had a "thousand yard stare," "was unsteady on his feet," staring straight ahead, and "just didn't look like a normal person that you could communicate with[.]" Deputy Green indicated that based on his experience, he believed Bollheimer was under the influence and impaired, not someone who was "groggy" from being asleep. Specifically, Deputy Green testified that Bollheimer was acting like an individual who was no longer high from methamphetamine, but was coming down from using the drug.

{¶ 36} Deputy Green also testified that in the process of arresting Cullers, he observed drug paraphernalia and "obvious meth" on the vanity. According to Deputy Green, the drug paraphernalia, including meth pipes, a glass plate, a ten-dollar bill, and baggies of a substance later confirmed to be methamphetamine, littered "almost the whole entire counter." Deputy Green indicated the amount of methamphetamine found in Room 259 was "a lot." The deputy then sent the substance discovered in Room 259 to the laboratory for testing, which revealed that the baggies contained methamphetamine in the weight of .16 grams and 7.54 grams.

{¶ 37} The state then presented testimony from the housekeeper. In addition to testifying regarding the events leading up to the entry and search of Room 259, which mirrored her testimony from the suppression hearing, the housekeeper further testified that she saw Bollheimer and Cullers checking in together the day before they were arrested. Although she did not see Bollheimer and Cullers go to Room 259, she recognized them when she knocked on the room's door to inquire about their rental status.

{¶ 38} Cullers also testified at trial and indicated he and Bollheimer checked in to the motel and were staying in Room 259 the day of their arrests. He further indicated he and Bollheimer were the only people to stay in Room 259 and that they were both in the room for the same amount of time. According to Cullers, Bollheimer was coming down from methamphetamine when the police arrived. While he could not recall whether he and Bollheimer purchased the drugs together, he described the drugs as "ours." Cullers further confirmed that he and Bollheimer both used the methamphetamine that was found in Room 259 and described Bollheimer's use of that methamphetamine. Specifically, Cullers testified Bollheimer "heated it up" and snorted the methamphetamine with a straw that was found on the bathroom vanity in Room 259 on the day of their arrests.

{¶ 39} Lastly, the state presented testimony from Deputy John Mann, who testified that after securing the scene, he transported Bollheimer from the motel to the jail. According to Deputy Mann, upon arriving at the jail he began the booking process with Bollheimer. During the booking process, Bollheimer answered a few questions, and indicated he had used methamphetamine the previous evening.

{¶ 40} Bollheimer then presented the testimony of Officer Richardson, who completed the prebooking process with Bollheimer at the jail after Bollheimer's arrest. The officer testified that he met with Bollheimer and completed a prebooking questionnaire. The officer further testified that, when completing the questionnaire, he marked that Bollheimer did not admit to ingesting drugs to avoid arrest and that the officer did not believe Bollheimer appeared under the influence of drugs or alcohol. However, on cross-examination, Officer Richardson testified he may not have marked that Bollheimer was under the influence if Bollheimer had admitted to using methamphetamine the day before. The officer further testified that if Bollheimer was coming down from methamphetamine use, he may not have marked that Bollheimer was under the influence of drugs or alcohol.

{¶ 41} Bollheimer claims that the evidence presented at trial proves that Cullers was the only individual who possessed the drugs found in Room 259. According to Bollheimer, "there was no evidence of [Bollheimer] *actively* participating in anything other than sleeping." However, after a full and thorough review of the record, we find Bollheimer's conviction for aggravated possession of drugs was not against the manifest weight of the evidence.

{¶ 42} In support of his claim, Bollheimer relies heavily on the fact that he did not have drugs on his person when he was arrested and that the drugs were closer to Cullers at the time of the search. Notwithstanding those facts, there was ample evidence in the record from which the jury could have concluded that Bollheimer was conscious of the methamphetamine's presence in Room 259 and that he was able to exercise dominion and control over that item. Specifically, Cullers' testimony revealed that he and Bollheimer were the only individuals staying in Room 259 and that they both were in the room for the same amount of time. According to Deputy Green, when he entered the room, there was "a lot" of meth on the bathroom vanity and the meth pipes, glass plate, baggies, and other drug paraphernalia covered the entire vanity. Although Bollheimer was lying on a bed when officers entered the room, the record reflects the bathroom vanity and bed were in close proximity to one another. As such, the testimony presented at trial established that a significant amount of drugs was discovered in the small motel room where Bollheimer and Cullers spent equal time, and that those drugs were readily accessible and in close proximity to Bollheimer at the time of the search. Such testimony constitutes circumstantial evidence that Bollheimer was in constructive possession of the drugs. *State v. Fultz*, 12th Dist. Butler No. CA2015-06-103, 2016-Ohio-1486, ¶ 23.

{¶ 43} Furthermore, Cullers' testimony, if believed, established that Bollheimer had dominion or control over the drugs found in Room 259 because he had access to and used them. Notably, despite Bollheimer's claims to the contrary, Cullers testified the

- 14 -

methamphetamine found in Room 259 belonged to him and Bollheimer, and described the drugs as "ours." Moreover, Cullers specifically described Bollheimer's method of ingesting the drugs found in Room 259, and further identified the straw which Bollheimer used to ingest the meth. Cullers also noted that Bollheimer had used the drugs the night before he was arrested. This testimony is consistent with Deputy Green's observations that Bollheimer appeared to be coming down from using methamphetamine, as opposed to being under the influence or recently asleep. Cullers' testimony is also consistent with Deputy Mann's testimony, who indicated Bollheimer stated he had used methamphetamine the evening before he was arrested. Although Officer Richardson testified he did not recall Bollheimer making such a statement, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289 at ¶ 114. The mere fact that the jury chose to disbelieve the defense theory of Bollheimer's knowledge and possession of the drugs in Room 259, and instead chose to believe the state's version, is insufficient to find that the jury lost its way or created a manifest miscarriage of justice. As such, after reviewing the record, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that Bollheimer's conviction must be reversed.

{¶ 44} In light of the foregoing, having found Bollheimer's conviction for aggravated possession of drugs was not against the manifest weight of the evidence, we necessarily conclude the state presented sufficient evidence to support the jury's finding of guilt. Accordingly, Bollheimer's second and third assignments of error are overruled.

{¶ 45} Assignment of Error No. 4:

{¶ 46} THE JUDGE COMMITTED PREJUDICIAL ERROR IN NOT GIVING THE PROPER JURY INSTRUCTION IN ACCORDANCE WITH OHIO REVISED CODE § 2923.03.

- 15 -

{¶ 47} In his fourth assignment of error, Bollheimer contends the trial court erred in giving the jury an accomplice testimony instruction which did not comply with R.C. 2923.03(D). Specifically, Bollheimer argues the trial court presented a "diluted" interpretation of the instruction that violated his due process rights.

{¶ 48} A trial court must charge a jury with instructions that are a correct and complete statement of the law. *Marshall v. Gibson*, 19 Ohio St.3d 10, 12 (1985). However, the precise language of a jury instruction is within the discretion of the trial court. *State v. Bailey*, 8th Dist. Cuyahoga No. 81498, 2003-Ohio-1834, ¶ 51, citing *State v. Guster*, 66 Ohio St.2d 266, 271 (1981).

{¶ 49} In situations where an accomplice testifies against a defendant, trial courts are statutorily required to give a special jury instruction. R.C. 2923.03(D). Specifically, R.C. 2923.03(D) provides that if an alleged accomplice testifies against a defendant in a case, the court shall charge the jury substantially as follows:

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

In the case at bar, the trial court instructed the jury as follows:

> You have heard testimony from Justin Cullers who is another person who pleaded guilty to charges arising out of the same crime charged in this case. We will call this person an accomplice, one who knowingly assists or joins another in the commission of a crime. Whether Justin Cullers was an accomplice and the weight to be given to his testimony, are matters for you to determine. An accomplice may have special motives for testifying. The testimony of a person you find to be an accomplice, should be viewed with grave suspicion and weighed with great caution.

{¶ 50} The trial court's instruction, although not a verbatim recitation of language set forth in R.C. 2923.03(D), mirrors the language found in the standard jury instruction for the testimony of an accomplice from the Ohio Jury Instructions. *See Ohio Jury Instructions*, CR Section 409.17, alternative number one (Rev. Oct.14, 2017).[2] This court has held that an instruction which informs the jury that the testimony of an accomplice should be viewed with suspicion and weighed with caution substantially complies with the requirements of R.C. 2923.03(D). *State v. Tumbleson*, 105 Ohio App. 3d 693, 697-698 (12th Dist.1995), citing *State v. Adams*, 9th Dist. Wayne No. 2621, 1992 Ohio App. LEXIS 786, *7 (Feb. 26, 1992). Here, the instruction the trial court used clearly informed the jury that it should view Cullers' testimony with grave suspicion and weigh the testimony with great caution. As such, we find the trial court substantially complied with R.C. 2923.03(D) and that it adequately charged the jury with instructions that were a correct and complete statement of the law. Accordingly, because the trial court adequately charged the jury, we find it did not abuse its discretion in giving the instruction at issue. Bollheimer's fourth assignment of error is therefore overruled.

{¶ 51} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.

---

2. Alternative number one to Ohio Jury Instructions CR Section 409.17 states the following: "You have heard testimony from _____, another person who (pleaded guilty to) (is accused of) the same crime charged in this case and is said to be an accomplice. An accomplice is one who (purposely) (knowingly) (assists) (joins) another in the commission of a crime. Whether _____ was an accomplice and the weight to give his testimony are matters for you to determine. Testimony of a person who you find to be an accomplice should be viewed with grave suspicion and weighed with great caution."